UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ROBERT MYERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:18-cv-30122-KAR |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR ORDER
REVERSING THE COMMISSIONER'S DECISION AND DEFENDANT'S MOTION TO
AFFIRM THE DECISION OF THE COMMISSIONER
(Docket Nos. 22 & 29)

ROBERTSON, U.S.M.J.

I.    INTRODUCTION

Robert Myers ("Plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) seeking review of a final decision of the Acting Commissioner of Social Security

("Commissioner") denying his application for Supplemental Security Income ("SSI").  Plaintiff

applied for SSI on March 18, 2014, alleging an October 1, 2013 onset of disability due to

degenerative disc disease ("DDD") and learning difficulties (A.R. at 87, 153). [1]  On April 14,

2017, the Administrative Law Judge ("ALJ") found that Plaintiff was not disabled and denied his

application for SSI (A.R. at 70-86).  The Appeals Council denied review (A.R. at 6-9) and, thus,

Plaintiff is entitled to judicial review.  *See Smith v. Berryhill,* 139 S. Ct. 1765, 1772 (2019).

---

[1] A copy of the Administrative Record (referred to herein as "A.R.") has been filed under seal
(Dkt. No. 15).

Plaintiff appeals the Commissioner's denial of his claim on the ground that the decision is not supported by "substantial evidence" under 42 U.S.C. § 405(g).  Pending before this court are Plaintiff's motion requesting that the Commissioner's decision be reversed or remanded for further proceedings (Dkt. No. 22), and the Commissioner's motion for an order affirming the decision of the ALJ (Dkt. No. 29).  The parties have consented to this court's jurisdiction (Dkt. No. 10).  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  For the reasons stated below, the court will grant the Commissioner's motion for an order affirming the decision and deny Plaintiff's motion.

II.   FACTUAL BACKGROUND

Plaintiff presents multiple grounds supporting his contention that the Commissioner's decision should be reversed or remanded (Dkt. No. 22-1).  Because Plaintiff's arguments mostly concern Plaintiff's back condition and mental health, the background information will be limited to the facts that are relevant to those issues.

A.   Plaintiff's Educational Background and Work History

Plaintiff was forty-seven years old on the date of the July 14, 2016 hearing (A.R. at 626, 633).  He was married and lived with his wife and five of his seven children whose ages ranged from nineteen to ten (A.R. at 154, 633, 666).  Plaintiff left school in the tenth grade and had worked delivering newspapers, driving a taxi, and washing dishes (A.R. at 186).  In July 2013, he began stocking shelves, doing maintenance work, and operating the cash register at an Ocean State Job Lot store where he frequently lifted fifteen to twenty pounds and occasionally lifted fifty pounds while performing his duties (A.R. at 186, 634, 635, 636-37, 639).  Plaintiff stopped working at Ocean State Job Lot in March or April 2014 because he failed to adhere to his work schedule and had too many "infractions" (A.R. at 634, 642-43, 644).

B.   Plaintiff's Physical Condition

On October 20, 2013, about two months after Plaintiff started the new job that involved lifting heavy objects, he presented at the emergency department of the North Adams Regional Hospital complaining of left flank pain associated with "lifting, motion or positioning" (A.R. at 325).  The condition was diagnosed as "likely musculoskeletal in nature" (A.R. at 326).  Plaintiff was advised to take ibuprofen and to rest and avoid heavy lifting (A.R. at 326).

Plaintiff was seen in the North Adams Regional Hospital emergency department seven days later for anxiety (A.R. at 319, 320).  Plaintiff reported that ibuprofen had relieved his back pain and he was attempting to change the way he lifted heavy objects (A.R. at 319).  A physician's palpation of Plaintiff's paralumbar muscles produced minimal discomfort (A.R. at 320).  Plaintiff was discharged after receiving Ativan (A.R. at 320).

Two days later, on October 29, 2013, Plaintiff visited his PCP, Shaohua Tang, M.D. of Integrative Medicine in North Adams, complaining of low back pain and discomfort in his left groin area (A.R. at 394).  He reported that his job entailed "a lot of lifting" (A.R. at 394).  There was mild tenderness in his lumbar area and his lumbar flexion was "slightly limited" by pain (A.R. at 395).  There was no muscle atrophy or costovertebral angle ("CVA") tenderness (A.R. at 395).  Dr. Tang advised Plaintiff to avoid lifting or carrying heavy objects and doing "strenuous physical work" (A.R. at 395).

Plaintiff visited the emergency department the next day, October 30, 2013, again complaining of pain in his left flank, hip, and back (A.R. at 309).  Plaintiff's sensory and motor functions were intact (A.R. at 309).  An x-ray of Plaintiff's lumbar spine revealed disc space narrowing at L5-S1 with degenerative changes (A.R. at 311).  Minor spondylolisthesis and spondylolysis were also observed (A.R. at 311, 392).  The diagnosis was back pain with left lumbar radiculopathy (A.R. at 310).

The record of Plaintiff's visit to Dr. Tang on November 5, 2013 indicates that Plaintiff's low back pain was mainly on the left side and moved down his left leg (A.R. at 392). The physical examination of his back revealed mild tenderness in the lumbar area (A.R. at 393). Lumbar flexion was "slightly limited" due to pain (A.R. at 393). The straight leg elevation test showed "65 degrees [on the] left side" and "80 degrees [on the] right side" (A.R. at 393). There was no muscle atrophy or CVA tenderness (A.R. at 393). Dr. Tang discussed treatments for DDD and repeated his instructions to avoid lifting or carrying heavy objects and performing "strenuous physical work" (A.R. at 393). Plaintiff indicated that he wanted to try an injection treatment (A.R. at 393).

During Plaintiff's January 15, 2014 visit to Dr. Tang, he reported low back pain and leg numbness "from time to time" (A.R. at 390). Plaintiff stated that he was performing "physical work with lots of bending and lifting" (A.R. at 390). Dr. Tang's examination of Plaintiff's lumbar area revealed mild tenderness, normal range of motion, no muscle atrophy, no CVA tenderness, and no peripheral edema (A.R. at 391). Dr. Tang advised Plaintiff to avoid "prolonged" walking and standing, heavy lifting or carrying, and "strenuous physical work" (A.R. at 391). Dr. Tang reviewed Plaintiff's October 2013 x-ray and characterized Plaintiff's DDD as "mild" (A.R. at 39). He ordered an MRI study (A.R. at 391).

Plaintiff returned to the emergency department on January 17, 2014 with complaints of left lower quadrant discomfort and back pain without radicular symptoms down either leg (A.R. at 301). The physical examination revealed that Plaintiff's gait and motor and sensory reflexes were within normal limits (A.R. at 301). He was instructed to take ibuprofen (A.R. at 303).

Plaintiff underwent an MRI of his lumbar spine on January 27, 2014 (A.R. at 299). The impression was that Plaintiff had mild, grade 1 anterolisthesis of L5 on S1 due to bilateral pars

defects (A.R. at 299).  "This [was] associated with a diffuse annular bulge and vertebral body spurring, all of which combine[d] to result in severe left and moderate right foraminal narrowing. The left L5 nerve root appear[ed] compressed" (A.R. at 299-300).

Plaintiff returned to Dr. Tang on January 31, 2014 and reported that he had reduced his physical activities and his back pain was "somewhat better" (A.R. at 388).  However, he had mild numbness in his left leg and "some pain" in his right leg (A.R. at 388).  Dr. Tang's physical examination of Plaintiff's back revealed mild tenderness in the lumbar area (A.R. at 389).   The lumbar range of motion and straight leg elevation on both sides were normal (A.R. at 389). There was no muscle atrophy, CVA tenderness, or peripheral edema (A.R. at 389).  Dr. Tang instructed Plaintiff to "avoid heavy lifting and carrying," perform lumbar stretching exercises and local massage, and use a heating pad (A.R. at 389).

When Plaintiff saw Dr. Tang on March 20, 2014 with complaints of neck pain, he indicated that his back pain was "not so bad lately" (A.R. at 385).  Dr. Tang examined Plaintiff's lower back (A.R. at 386).  His observations were consistent with those of the prior visit; that is, mild tenderness, normal range of motion of the cervical spine, and no muscle atrophy, CVA tenderness, or peripheral edema (A.R. at 386).  Dr. Tang indicated that Plaintiff's low back pain appeared "relatively stable" and was "not . . . bothering [him] now" (A.R. at 386).  The physician "encouraged [Plaintiff] to do suitable physical work, but [to] avoid heavy physical work" (A.R. at 386).

Plaintiff completed a Social Security Administration ("SSA") Work Activity Report on March 26, 2014 indicating that he could lift twenty pounds (A.R. at 192, 198).  On Plaintiff's March 30, 2014 Questionnaire on Pain, he indicated that medication relieved his pain for about six hours, although he could still feel it (A.R. at 202-03).

The notes of Plaintiff's May 1, 2014 visit to Dr. Tang indicated that Plaintiff was generally "feeling fine" (A.R. at 383).  Again, Dr. Tang observed mild tenderness in Plaintiff's lower cervical spine, normal cervical spine range of motion, no muscle atrophy, and no peripheral edema (A.R. at 384).

On June 6, 2014, Plaintiff reported that his back pain was five on a ten point scale and was "relatively stable" (A.R. at 381).  Dr. Tang noted that Plaintiff's back condition was the same as the previous month (A.R. at 382).  Plaintiff received lidocaine injections into eight trigger points in his low back (A.R. at 382).

During Plaintiff's September 10, 2014 visit to Dr. Tang, he reported that he still experienced low back pain, but the trigger point injections enabled him to function (A.R. at 378). The results of Dr. Tang's physical examination of Plaintiff's lumbar area remained the same: mild tenderness; normal range of motion; no muscle atrophy; no CVA tenderness; and no peripheral edema (A.R. at 378).  Dr. Tang administered trigger point injections (A.R. at 378).

The record of Plaintiff's October 10, 2014 visit to Dr. Tang indicates that Plaintiff experienced intermittent low back pain (A.R. at 375, 376).  Upon examination, the condition of Plaintiff's back remained the same (A.R. at 376).  Dr. Tang administered trigger point injections and referred Plaintiff for physical therapy ("PT") (A.R. at 376, 377).

On October 13, 2014, Plaintiff visited the Berkshire Medical Center Satellite Emergency Facility because he was experiencing chest pain (A.R. at 274).  He did not have back pain (A.R. at 275).  The examination of Plaintiff's back showed there was no CVA or midline point tenderness and his range of motion was normal (A.R. at 276).

Plaintiff's October 28, 2014 evaluation at Williamstown Physical Therapy indicated that his lumbar flexion range of motion was 25% limited and his lumbar extension range of motion

was 50% limited (A.R. at 462).  His symptoms were consistent with thoracic and lower back

pain that was exacerbated by "poor lifting mechanics, poor postural control, decreased muscle

tissue extensibility, and poor strength" (A.R. at 462).  The therapist recommended that Plaintiff

attend PT twice a week for four weeks (A.R. at 463).  Plaintiff attended a therapy session on

October 28 (A.R. at 450).

On October 31, 2014, Plaintiff saw Dr. Tang with complaints of chest pain (A.R. at 373).

The results of the physical examination of his lumbar area were consistent with the results of Dr.

Tang's prior examinations (A.R. at 374).  Plaintiff reported that PT relieved his back pain, but he

wished to continue the trigger point injections, which Dr. Tang administered (A.R. at 373, 374).

Plaintiff attended PT sessions on November 5, 12, 14, 21, and 25, 2014, but missed

sessions on November 7 and 19 (A.R. at 448, 449, 450).  On November 12, 2014, Plaintiff

indicated that he felt better after the previous PT appointment (A.R. at 448).  At the November

25, 2014 appointment, he reported that his back was feeling better "lately" (A.R. at 449).

Plaintiff visited Dr. Tang on December 3, 2014 to receive a trigger point injection

treatment for his lower back (A.R. at 372).  Plaintiff reported that the injections "really help[ed]"

for "some days" (A.R. at 372).  Dr. Tang indicated that Plaintiff's lumbar range of motion was

normal and his low back pain was "stable" (A.R. at 372).

The January 13, 2015 letter from Williamstown Physical Therapy to Dr. Tang indicated

that Plaintiff had attended six PT sessions, but had not received PT between November 25, 2014

and January 13, 2015 (A.R. at 444).  Consequently, "there was a setback in his progress" (A.R. at

444).  The therapist recommended continuing PT twice a week for six weeks (A.R. at 444).

Plaintiff indicated that he was "feeling okay" due to the injections that Dr. Tang administered on

that date (A.R. at 445).

During Plaintiff's preventive physical examination on February 4, 2015, he told Dr. Tang that the trigger point injections relieved his lower back pain (A.R. at 368).  Again, Dr. Tang observed minimal tenderness in Plaintiff's lumbar area and no muscle atrophy or CVA tenderness (A.R. at 370).  He assessed Plaintiff's low back pain and DDD as "stable" (A.R. at 370).

Plaintiff received trigger point injections on February 10 and March 5, 2015 (A.R. at 367, 458).  On those dates, Plaintiff's condition was "relatively stable," his lumbar area was mildly tender, and his lumbar range of motion was normal (A.R. at 367, 458).

Plaintiff attended PT sessions on February 4, 11, and 13, 2015 (A.R. at 442, 445).  Plaintiff indicated that he felt better for "about two days" after receiving PT (A.R. at 442).  By a February 13, 2015 letter, Williamstown Physical Therapy notified Dr. Tang that Plaintiff "has attended PT for 9 visits since 10/28/14 and shows poor compliance [with a] home exercise program" (A.R. at 441).  The letter further indicated that Plaintiff reported "some improvement in his pain to a 4/10" (A.R. at 441).  According to the letter, Plaintiff could stand and walk for five to ten minutes (A.R. at 441).  The therapist recommended continuing PT once or twice a week for two weeks (A.R. at 441).  Plaintiff was discharged from PT on March 3, 2015 because he was "non-compliant [with] appointments" (A.R. at 440).

On October 30, 2015, Plaintiff presented at the Berkshire Medical Center emergency department with dental pain (A.R. at 490).  He had full range of motion in his back and no CVA tenderness (A.R. at 492).

On November 19, 2015, an ambulance transported Plaintiff to the Berkshire Medical Center emergency department with complaints of pain on his right side (A.R. at 499).  He had no

CVA tenderness in his back, had normal range of motion, and had no tenderness or edema in his extremities (A.R. at 500).

Plaintiff returned to the Berkshire Medical Center emergency department on February 11, 2016 after he experienced dizziness, especially when he stood up quickly (A.R. at 514, 517). Plaintiff reported that his chronic low back pain with paresthesia in the left leg had improved with exercise (A.R. at 514).  The physical examination of his back revealed no CVA, midline vertebra, or paraspinal tenderness (A.R. at 515).  Plaintiff's range of motion was normal and his gait was steady (A.R. at 512, 515).

Plaintiff visited CHP North Adams Family Medicine on March 31, 2016 complaining of pain on his right side and in his lower back, which radiated to his right thigh and left foot, but without numbness in his legs and feet (A.R. at 557).  He indicated that the pain was aggravated by "movement/positioning, flexing [his] back, [and] lifting more than [twenty] pounds" (A.R. at 557).  Plaintiff reported that rest, heat, and over-the-counter medication (Aleve) relieved the pain (A.R. at 557).  Plaintiff ambulated normally (A.R. at 559).  The examination by Marguerite Vardman, N.P., revealed tenderness of Plaintiff's left spine, positive standing and sitting flexion tests on the right side, unequal leg lengths, and normal movement of all his extremities (A.R. at 560).  N.P. Vardman observed abnormal lordosis of Plaintiff's back (A.R. at 560).

Dr. Bruce Navom of Living Well Chiropractic, LLC evaluated Plaintiff on April 2, 2016 and noted "[s]egmental and somatic dysfunction of [the] sacral region" and "low back pain" (A.R. at 585).  Dr. Navom performed spinal adjustments (A.R. at 585).

The April 7, 2016 x-rays of Plaintiff's lumbar spine revealed the previously viewed pars defect at L5 with spondylolisthesis of L5 over S1 (A.R. at 524).  "Vertebral body height [was]

maintained.  Flexion-extension views demonstrate marked movement of 9 mm indicating presence of instability" (A.R. at 524).

The treatment record of Plaintiff's visit to N.P. Vardman on April 18, 2016 states that he was walking for exercise and his lumbar radiculopathy was "improving" (A.R. at 570, 573). Plaintiff reported that his back felt "much better" after Dr. Novom's chiropractic treatment (A.R. at 570).  His gait was normal on that date (A.R. at 573).

On April 19, 2016, Plaintiff presented at the emergency department complaining of pain in his lower abdomen (A.R. at 536).  He stated "that he had been golfing the past couple days" and indicated that "he probably strained his abdominal muscles" (A.R. at 530, 532, 536).  His ability to walk was not impaired (A.R. at 536).  He had full range of motion and no CVA tenderness in his back (A.R. at 537).  He was diagnosed with diverticulitis (A.R. at 533, 539, 542).

Plaintiff was ambulating normally during his May 4, 2016 visit to Anping Han, M.D. at CHP (A.R. at 576, 578).  Based on Plaintiff's chronic back pain, Dr. Han referred Plaintiff to Joshua Yurfest, M.D. (A.R. at 33).

Plaintiff visited Dr. Yurfest on July 5, 2016 with complaints of lower back pain that radiated into both of his legs and sometimes produced numbness and weakness (A.R. at 586). Plaintiff reported that his pain was five on ten point scale (A.R. at 586).  Plaintiff told Dr. Yurfest that physical therapy and chiropractic manipulation did not relieve the pain, but trigger point injections provided relief (A.R. at 586).  Upon examination, Dr. Yurfest noted that trigger points were present in the piriformis muscle, gluteus maximus, gluteus medius, and lumbar paraspinals (A.R. at 587).  Assessment of Plaintiff's back revealed that straight leg raises ("SLR") were negative, the PSIS level was equal, and kyphosis and scoliosis were absent (A.R.

at 587).  Dr. Yurfest reviewed the April 4, 2016 x-rays of Plaintiff's lumbar spine and indicated

that Plaintiff's "pain syndrome [was] secondary" to the increased movement at the L5-S1 level

(A.R. at 587).  Dr. Yurfest further indicated that the electrodiagnostic studies were normal

thereby excluding a lumbar radiculopathy (A.R. at 587).  Plaintiff rejected surgical intervention

(A.R. at 587).  The physician recommended PT and core strengthening exercises (A.R. at 587).

Plaintiff was evaluated by Adams Physical Therapy, LLC on July 18, 2016 (A.R. at 595-

98, 600-01).  Plaintiff reported that he experienced pain when lifting and bending (A.R. at 595).

He could walk about 100 yards, sit for about thirty minutes, and stand for about ten minutes

without pain (A.R. at 595, 600, 601).  Plaintiff indicated that he was unable to carry anything

(A.R. at 600).  Upon examination, Plaintiff's lumbar flexion range of motion/strength were 4/5

and his hip range of motion/strength ranged from 4/5 to 5/5 (A.R. at 596).  Plaintiff attended a

PT session on July 20, 2016 (A.R. at 593).  The therapist told Plaintiff that PT would not "fix"

his condition and that surgery usually was indicated (A.R. at 593).

C.    Plaintiff's Mental Condition

Plaintiff presented records of The Brien Center spanning the period from September 11,

2014 to November 20, 2014 (A.R. at 410-29).[2]  During the initial evaluation on September 11,

2014, Plaintiff reported that family and friends supported him and his activities of daily living

were not limited (A.R. at 417).  The mental status exam revealed that Plaintiff's appearance, eye

contact, speech, mood, affect, facial expression, perception, thought content, thought process,

intellectual functioning, orientation, memory, insight, and judgment were within normal limits

(A.R. at 420).  His behavior was relaxed (A.R. at 420).  He was diagnosed with anxiety disorder

NOS (A.R. at 425).  On September 30, 2014, Plaintiff reported that he had increased his

---

[2] No additional reports from The Brien Center were included in the Administrative Record.

activities and was spending more time with his family (A.R. at 410-11).  The counselor and

Plaintiff discussed anxiety management on October 14, 2014 (A.R. at 412-13).  On November

20, 2014, the counselor did not observe or report any significant changes in Plaintiff's condition

(A.R. at 414).

The records of Plaintiff's emergency department visits on January 17, 2014, April 2,

October 31, and November 19, 2015, and February 11 and April 19, 2016 indicated that

Plaintiff's mood and affect were normal (A.R. at 301, 479, 480, 490, 492, 499, 500, 514, 515,

536, 537, 570, 573).  The records indicated no depression on April 2, 2015 and no anxiety,

depression, or suicidal thoughts on October 31, 2015 and April 19, 2016 (A.R. at 479, 490, 536).

Treatment records of October 29, 2013, January 15 and 31, March 20, May 1, June 6, October 10

and 31, 2014, February 4 and March 23, 2015, and March 31 and July 5, 2016 indicated no sleep

disturbances or insomnia (A.R. at 368, 373, 375, 381, 383, 385, 388, 390, 394, 456, 557-58,

586).

On March 31, 2016, N.P. Vardman noted Plaintiff's report that his depression and anxiety

had improved after he stopped drinking alcohol and started taking vitamins (A.R. at 558).  N.P.

Vardman observed that Plaintiff was active and alert and his mood and affect were normal (A.R.

at 559).  Dr. Han made the same notation on April 14, 2016 (A.R. at 573).

D.      Consultative Examiner's Evaluation

Teena Guenther, Ph.D., conducted a consultative examination of Plaintiff on August 13,

2014 (A.R. at 401).  Plaintiff reported "a long history of learning difficulties" and participation in

special education, including remedial classes at school (A.R. at 401).  He expressed difficulty

with reading comprehension, spelling, concentration, and memory (A.R. at 401, 409).  His wife

assisted him with paperwork because his math skills were subpar (A.R. at 401, 404, 406).

12

Plaintiff described symptoms of depression and anxiety, including "what may be panic attacks" (A.R. at 403-04).  His hobbies and interests were limited to playing video games with his children (A.R. at 406).  He reported having "limited" social contacts and difficulty sleeping (A.R. at 403).

On the mental status examination, Plaintiff's gait and motor behavior were normal, his eye contact was appropriate, his thought processes were concrete, and his insight and judgment were fair (A.R. at 404).  "His speech [was] fluent and intelligible but there . . . [were] some expressive language difficulties, as he ha[d] trouble organizing or articulating his thoughts" (A.R. at 404).  He "often" asked Dr. Guenther to repeat or clarify her questions (A.R. at 404, 406-07).

Dr. Guenther administered intellectual and achievement tests (A.R. at 404-06).  On the WRAT-4 subtests, Plaintiff's grade equivalents were as follows:  reading was 11.2; spelling was 3.9; and mathematics was 2.9 (A.R. at 405, 406).  Plaintiff's full-scale IQ, as measured by the WAIS-IV, was 77 (A.R. at 405).  His verbal comprehension score of 85 was in the 16th percentile, his perceptual reasoning score of 81 was in the 10th percentile, his working memory score of 77 was in the 6th percentile, and his processing speed score of 79 was in the 8th percentile (A.R. at 405).  His verbal comprehension index and perceptual reasoning scores "placed him in the low average range of intellectual functioning" and his working memory and processing speed scores were deemed to be "borderline" (A.R. at 405).

Dr. Guenther determined that Plaintiff's test scores reflected "a learning disability/border intellectual functioning" (A.R. at 406).  She opined that Plaintiff was capable of "following and understanding simple directions and instructions" (A.R. at 407).  He might have difficulty, however, executing more complicated requests and completing tasks efficiently or on time (A.R.

at 407).  Based on Plaintiff's description of being "a bit socially withdrawn," the examiner indicated that he might have difficulty relating to co-workers (A.R. at 407).  Dr. Guenther diagnosed Plaintiff with anxiety disorder NOS, depressive disorder NOS, "borderline intellectual functioning (versus learning disorder NOS)," and a learning disability (A.R. at 407).  She assigned a GAF score of 55 (A.R. at 407).[3]  The examiner concluded that "considering the presence of the learning difficulties and psychiatric symptoms, the results of the present evaluation are consistent with the [Plaintiff's] allegations" (A.R. at 407).  She recommended formal psychiatric intervention and vocational rehabilitation and training and listed the prognosis as "fair" (A.R. at 407-08).

     E.      <u>State Agency Consultants' Opinions</u>

         1.    2014

On July 8, 2014, S. Ram Upadhyay, M.D., assessed Plaintiff's physical residual functional capacity ("RFC") based on a review of his records (A.R. at 92-94).  Dr. Upadhyay opined that Plaintiff could:  lift twenty pounds occasionally and ten pounds frequently; stand and/or walk and sit for about six hours in an eight hour workday with normal breaks; occasionally climb ramps, stairs, ladders, ropes, or scaffolds, stoop, and crawl (A.R. at 93).  Dr. Upadhyay opined that Plaintiff was capable of performing light work and was not disabled (A.R. at 96-97).

---

[3] A Global Assessment of Functioning ("GAF") score between 51 and 60 "indicates moderate symptoms or moderate difficulty in social, occupational or school functioning."  *Kem v. Berryhill*, 352 F. Supp. 3d 101, 105 n.1 (D. Mass. 2018) (citing Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (DSM–IV) 34 (4th ed., text rev. 2000)).

Jon Perlman, Ed.D., assessed Plaintiff's mental RFC on August 26, 2014 (A.R. at 94-95). Dr. Perlman determined that Plaintiff had mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning and concentration, persistence, or pace, and no repeated episodes of decompensation (A.R. at 91). Specifically, Dr. Perlman opined that Plaintiff's ability to understand, remember, and carry out detailed instructions was moderately limited, but Plaintiff could understand and remember simple instructions (A.R. at 94). Plaintiff's ability to maintain attention and concentration for extended periods, complete a normal workday and workweek without interruption from psychologically based symptoms, and perform at a consistent pace were moderately limited (A.R. at 94-95). According to Dr. Perlman, Plaintiff could complete simple, routine tasks and maintain concentration for at least two hours when performing simple one and two step tasks (A.R. at 95). Finally, Dr. Perlman opined that Plaintiff's ability to get along with coworkers was moderately limited, although he could relate to others in a socially appropriate manner (A.R. at 95).

### 2. 2015

K. Malin Weeratne, M.D., conducted a reconsideration evaluation of Plaintiff's physical RFC on March 26, 2015 (A.R. at 454). Dr. Weeratne agreed with Dr. Upadhyay's opinion (A.R. at 454-55).

Kenneth Higgins, Ph.D., reconsidered Plaintiff's mental RFC on February 17, 2015 (A.R. at 453). Dr. Higgins adopted Dr. Perlman's assessment except Dr. Higgins opined that Plaintiff was markedly limited in his ability to carry out detailed tasks and moderately limited in his ability to interact with the general public (A.R. at 453).

### F. Function Reports

#### 1. March 2014

Plaintiff and his wife completed function reports on March 30, 2014 (A.R. at 204-11, 220-27). Plaintiff's wife's report mirrored Plaintiff's in most significant respects (A.R. at 220-27). Plaintiff described his daily activities as follows: he got up; showered; got coffee; watched the news; sometimes checked his mail on the computer; helped his wife get the children off to school; and ate, unless his pain was too intense (A.R. at 204). He indicated that he helped his wife care for the children and do the laundry (A.R. at 205, 206). Plaintiff's wife indicated that he vacuumed (A.R. at 222). Plaintiff prepared sandwiches, hot dogs, and reheated food in the microwave (A.R. at 206, 222). He went outside "often" (A.R. at 207, 223). He walked, rode in a car, or used public transportation (A.R. at 207, 223). Although Plaintiff had a driver's license, the family did not have a car in March 2014 (A.R. at 223). Plaintiff shopped in stores for food and clothing (A.R. at 207, 223). Shopping took "hours," however, because of his back pain and because he forgot what he needed (A.R. at 207, 223). He was able to handle the family's finances, but his wife was "better at it" (A.R. at 207, 223). Plaintiff listed his interests as "watching TV, listening to music [and] walking but not often" because of pain (A.R. at 208). Mrs. Myers indicated that Plaintiff also read the newspaper (A.R. at 224). According to Plaintiff, he "often" spent time sitting and visiting with others (A.R. at 208).

The function reports indicated that Plaintiff had the following physical limitations: lifting; squatting; bending; standing; reaching; walking; sitting; kneeling; and climbing stairs (A.R. at 209, 225). He could walk for five to ten minutes before resting for ten to fifteen minutes (A.R. at 209, 225). He indicated that his ability to dress himself was limited by his difficulty lifting his hands over his head for a long time (A.R. at 205, 221). In addition, he needed assistance getting out of the bathtub (A.R. at 205, 221). His back pain interfered with his sleep

(A.R. at 205, 211, 221).  He did not use assistive devices to walk, but wore glasses and used a back brace when lifting objects (A.R. at 210, 226).

Plaintiff and Mrs. Myers further indicated that his condition affected his memory, ability to complete tasks, and attention span (A.R. at 209, 225).  Although he had difficulty following written instructions, his ability to follow spoken instructions was "fairly OK" (A.R. at 209, 225).  He did not have any problems getting along with authority figures and had never lost a job due to problems interacting with others (A.R. at 210, 226).   He did not handle stress well, but was able to adapt to change over time (A.R. at 210, 226).

2.   December 2014

The second Adult Function Report form, which Plaintiff completed on December 5, 2014, indicated some changes in his activities (A.R. at 236-43).  Plaintiff stated that he rested at home most of the day and no longer helped his wife care for the children (A.R. at 236, 237).  He played video games with his children every day "for about an hour," played board games, read, and watched TV (A.R. at 240).  Plaintiff could vacuum using his right arm and clean the bathroom, but needed help doing the laundry because it was too heavy (A.R. at 238).  He became "fearful" when he went out alone (A.R. at 242).

In December 2014, Plaintiff needed assistance dressing, bathing, caring for his hair, and shaving (A.R. at 237).   In addition to the limitations indicated on the form that he completed in March 2014, Plaintiff stated that he had difficulty hearing, understanding, and following instructions (A.R. at 241).  Carpal tunnel limited the function of his hands (A.R. at 241).  "Glasses" were the only listed assistive device (A.R. at 242).  Plaintiff further indicated that he did not get along with authority figures and co-workers (A.R. at 242).

G.   The ALJ Hearing

17

Plaintiff and independent Vocational Expert ("VE") James T. Parker testified at the hearing before the ALJ on July 14, 2016 (A.R. at 255, 626).  Plaintiff described his lower back pain and mental condition.

       1.  Plaintiff's Testimony

Plaintiff's back pain began in 2014 (A.R. at 651, 662).  He described the pain as throbbing and rated its intensity as usually nine on a scale of one to ten (A.R. at 654-55).  Consequently, he had to recline for most of the day (A.R. at 655).  The pain interfered with his sleep (A.R. at 668, 669).  He recently had received an injection from Dr. Yurfest, which relieved the pain for two or three days (A.R. at 657).  The Baclofen that Dr. Yurfest prescribed relieved the pain, but made him drowsy, as did his other medications (A.R. at 669, 670).  He soaked in the bathtub for pain relief (A.R. at 669).

     The pain that radiated from his back down his leg was an "excruciating" and "horrible" "aching" and "burning" pain (A.R. at 653).  It felt "like liquid running [from his hip] down [his] leg" to his toes (A.R. at 653, 654).  He was taking Tylenol "like candy" but got no relief (A.R. at 653).  He switched to ibuprofen and even took oxycodone, but stopped because he did not want to become addicted and because it did not provide relief (A.R. at 653).

Plaintiff testified that he was able to lift a pound "her[e] and there . . . [m]aybe a [five pound] vacuum" (A.R. at 658, 659).  He could not perform a job that required him to regularly lift ten pounds (A.R. at 660).  He was not able to sit for more than about twenty minutes without having to stand, walk, or recline to relieve the pain (A.R. at 660-62).  He borrowed and drove friends' cars, but had to stop, get out of the car, and stretch if he sat too long (A.R. at 666).  After standing or walking for about ten minutes, he would have to sit or lay down (A.R. at 662).  At times, he had to hold the shopping cart in order to walk around Walmart and the grocery store

(A.R. at 662, 667).  Plaintiff told that ALJ that he would not be able to perform an assembly job

that permitted him to alternate between standing and sitting because "he wouldn't be able to keep

up with the assembly" (A.R. at 675).

Although the pain in his back forced him to recline "most" of the day (five or six hours),

he tried to walk around the block (A.R. at 663-64, 666, 676).  His wife did the laundry, cleaning,

and most of the cooking (A.R. at 667).  He watched TV or read "a lot" (A.R. at 664).  He mostly

read history books, Hardy Boys mysteries, and his phone (A.R. at 664).  The ALJ questioned

Plaintiff about the treatment note that indicated he had been golfing for two days (A.R. at 673).

Plaintiff testified that he sat in the golf cart after three holes (A.R. at 673-74).

Plaintiff stated that he had difficulty concentrating (A.R. at 665).  He took anxiety

medication "[o]ff and on" (A.R. at 671).

### 2.  The VE's Testimony

In order to elicit the VE's opinion of whether Plaintiff could perform his past jobs or jobs

that existed in the regional and national economy, the ALJ asked the VE to assume a person with

Plaintiff's age, education, and work experience who could engage in "light work which would

not require any more than occasional bending, crouching or twisting" (A.R. at 678).

> [T]he left dominant upper extremity [would be limited] to frequent but less than constant
> forceful grasping and twisting.  Also [based on] the side effects of some medications,
> [there would be] seizure precautions.  That is not to work at heights or around moving
> machinery.  The work should be of a simple one to two step nature, taught by
> demonstration, with rare changes in routine.

(A.R. at 678).  The VE testified that the hypothetical individual could not perform any of

Plaintiff's past relevant work, which was medium to heavy work (A.R. at 678-79).  However, the

hypothetical individual could perform the following light, unskilled jobs:  cafeteria attendant;

office cleaner; and flower picker (A.R. at 679).  Those positions are primarily performed while

standing (A.R. at 680).  If the hypothetical person had to be able to sit "on as an needed basis for up to two thirds of the day without having to go off task in order to sit," the VE opined that he could perform the following light, bench work jobs:  an assembler of small products; a laundry sorter and folder at a uniform cleaning facility; and price marker (A.R. at 680-81).  If the hypothetical person needed to stand for up to two-thirds of the day as needed without going off task, the following sedentary, unskilled positions were available:  inspection table worker; preparer, polisher of silver jewelry; and a final assembler of optical goods (A.R. at 682-83).  No jobs would be available to a person who was off task at least fifteen percent of the time due to pain and emotional considerations, or was late to work, or left work early, or was absent from work for three days per month (A.R. at 683-84).

III.    THE COMMISSIONER'S DECISION

A.    Legal Standard for Entitlement to Supplemental Security Income

In order to qualify for SSI, a claimant must demonstrate that he is disabled within the meaning of the Social Security Act.[4]  A claimant is disabled for purposes of SSI if he "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  A claimant is unable to engage in any substantial gainful activity when he

is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

---

[4] There is no challenge to Plaintiff's financial need for purposes of entitlement to SSI.  *See* 42 U.S.C. § 1381a.

42 U.S.C. § 423(d)(2)(A).  The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in the regulations promulgated by the SSA.  *See* 20 C.F.R. § 416.920(a)(4)(i-v).  The hearing officer must determine:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4) whether the impairment prevents the claimant from performing previous relevant work; and (5) whether the impairment prevents the claimant from doing any work considering the claimant's age, education, and work experience.  *See id; see also Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process).  If the hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step.  20 C.F.R. § 416.920(a)(4).

Before proceeding to steps four and five, the Commissioner must assess the claimant's RFC, which the Commissioner uses at step four to determine whether the claimant can do past relevant work and at step five to determine if the claimant can adjust to other work.  *See id.*

> RFC is what an individual can still do despite his or her limitations.  RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities

Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

The claimant has the burden of proof through step four of the analysis, including the burden to demonstrate his RFC.  *See Flaherty v. Astrue*, Civil Action No. 11-11156-TSH, 2013 WL 4784419, at *8-9 (D. Mass. Sept. 5, 2013) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).  At step five, the Commissioner has the burden of showing the existence of jobs

in the national economy that the claimant can perform notwithstanding his or her restrictions and limitations. *See Goodermote*, 690 F.2d at 7.

B.      The ALJ's Decision

In determining whether Plaintiff was disabled, the ALJ conducted the five-part analysis required by the regulations. *See* 20 C.F.R. § 416.920(a)(4)(i-v); *see also Goodermote*, 690 F.2d at 6-7.  At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date of March 15, 2014 (A.R. at 72). *See* 20 C.F.R. § 416.971 *et seq.*  At step two, the ALJ found that Plaintiff had the following severe impairments:  history of inguinal hernia, status post repair; left lumbar radiculopathy and disc degeneration; history of left (dominant) Cubital Tunnel Syndrome; and anxiety/depressive disorders, with history of learning disabilities and borderline intellect (A.R. at 72). *See* 20 C.F.R. § 416.920(c).  For purposes of step three, the ALJ reviewed Plaintiff's impairments and determined that his impairments, either alone or in combination, did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (A.R. at 72-75). *See* 20 C.F.R. §§ 416.920(d), 416.925, 416.926.

Before proceeding to steps four and five, the ALJ assessed Plaintiff's RFC for use at Step Four to determine whether he could perform past relevant work and, if the analysis continued to Step Five, to determine if he could do other work. *See* 20 C.F.R. § 416.920(e).  The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause his symptoms, but that his statements about the intensity, persistence, and limiting effects of the symptoms were not fully supported by the objective medical evidence and other relevant

evidence in the record (A.R. at 77).  The ALJ determined that the Plaintiff had the RFC to

perform light work[5] with the following additional limitations:

> no more than occasional bending, crouching or twisting; no more than [the] occasional
> need to reach overhead; left, dominant, hand/wrist limited to frequent, but less than
> constant forceful grasping or twisting motions; able to sit on as "as-needed" basis up to
> two thirds of the work-day, without having to come off task.  Work should be limited to
> simple 1-to-2 step tasks, taught by demonstration, with rare changes in routine.

(A.R. at 76).  At step four, the ALJ found that Plaintiff was not able to perform his past relevant

work (A.R. at 84).  *See* 20 C.F.R. § 416.965.  However, considering Plaintiff's age, education,

work experience, and RFC, based on the VE's testimony, the ALJ found that Plaintiff could

perform the light jobs of assembler of small parts, laundry sorter/folder, and price marker, which

permitted sitting on an as-needed basis for up to two-thirds of the day (A.R. at 85, 680-81).  *See*

---

[5] The SSA regulations define light work as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or
> carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very
> little, a job is in this category when it requires a good deal of walking or standing, or
> when it involves sitting most of the time with some pushing and pulling of arm or leg
> controls.  To be considered capable of performing a full or wide range of light work, [a
> claimant] must have the ability to do substantially all of these activities.  If someone can
> do light work, [the Commissioner] determine[s] that he or she can also do sedentary
> work, unless there are additional limiting factors such as loss of fine dexterity or inability
> to sit for long periods of time.

20 C.F.R. § 416.967(b).

The SSA regulations define sedentary work as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting
> or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is
> defined as one which involves sitting, a certain amount of walking and standing is often
> necessary in carrying out job duties.  Jobs are sedentary if walking and standing are
> required occasionally and other sedentary criteria are met.

20 C.F.R. § 416.967(a).

20 C.F.R. §§ 416.969, 416.969(a).  Even if Plaintiff was limited to sedentary positions, which allowed standing on an "as-needed" basis up to two thirds of the time without having to come off task, he could perform the jobs of inspector, preparer/polisher, and final assembler of optical goods (A.R. at 85).  *See* 20 C.F.R. §§ 416.969, 416.969(a).  Consequently, on April 14, 2017, the ALJ concluded that Plaintiff was not disabled (A.R. at 86).  *See* 20 C.F.R. § 416.920(g).

IV.   STANDARD OF REVIEW

The district court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for rehearing.  *See* 42 U.S.C. § 405(g).

Judicial review is limited to determining "'whether the [ALJ's] final decision is supported by substantial evidence and whether the correct legal standard was used.'"  *Coskery v. Berryhill,* 892 F.3d 1, 3 (1st Cir. 2018) (quoting *Seavey v. Barnhart,* 276 F.3d 1, 9 (1st Cir. 2001)).  The court reviews questions of law *de novo*, but "the ALJ's findings shall be conclusive if they are supported by substantial evidence, and must be upheld 'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion,' even if the record could also justify a different conclusion."  *Applebee v. Berryhill*, 744 F. App'x 6, 6 (1st Cir. 2018) (per curiam) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222-23 (1st Cir. 1981) (citations omitted)).  "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations."  *Biestek v. Berryhill,* 139 S. Ct. 1148, 1154 (2019) (citation omitted).  "Substantial-evidence review is more deferential than it might sound to the lay ear:  though certainly 'more than a scintilla' of evidence is required to meet the benchmark, a preponderance of evidence is not."  *Purdy v. Berryhill*, 887 F.3d 7, 13 (1st Cir. 2018) (quoting *Bath Iron Works Corp. v. U.S. Dep't of Labor*, 336 F.3d 51, 56 (1st Cir. 2003)).

24

In applying the substantial standard, the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence.  *See Applebee,* 744 F. App'x at 6.  That said, the ALJ may not ignore evidence, misapply the law, or judge matters entrusted to experts.  *See Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

V.   ANALYSIS

**A.    The Appeals Council did not err by determining that the additional treatment records would not have altered the ALJ's decision.**

Plaintiff first claims that the Appeals Council erroneously denied review of the ALJ's decision by refusing to consider the following treatment records he submitted:  notes of Plaintiff's visits to Dr. Han at CHP on August 4, October 31, and November 15, 2016, and April 5, 2017 (A.R. at 36, 40, 44, 48); records of Plaintiff's visits to Dr. Yurfest on February 28, April 25, and June 20, 2017, including a June 20, 2017 nerve conduction and EMG report of Plaintiff's right wrist (A.R. at 52-56, 58-59); and the record of Plaintiff's visit to Dr. Steven Will of Neurosurgery Professional Services of BMC on September 21, 2016 (A.R. at 61-64).  The Appeals Council rejected Dr. Yurfest's records dated April 25 through June 20, 2017 because they post-dated the ALJ's decision of April 14, 2017 (A.R. at 7).  As to the remaining records, the Appeals Council determined that the additional evidence "did not show a reasonable probability that [they] would change the outcome of the decision" (A.R. at 7).

"Although judicial review of an ALJ's decision must be based 'solely on the evidence presented to the ALJ,' Social Security regulations allow a claimant to introduce new and additional evidence upon a request for Appeals Council review."  *Lopez Davila v. Berryhill,* Civil Action No. 17-12212-ADB, 2018 WL 6704772, at *16 (D. Mass. Nov. 6, 2018), *rec. dec. adopted sub nom. Davila v. Berryhill,* 2018 WL 6499862 (D. Mass. Dec. 11, 2018) (quoting

*Mills v. Apfel,* 244 F.3d 1, 4-5 (1st Cir. 2001)).  "Accordingly, the First Circuit has held that

when the Appeals Council refuses to review the ALJ's decision, a reviewing court may consider

new evidence if the Appeal[s] Council's refusal was based on 'an egregiously mistaken ground.'"

*Id.* (quoting *Mills,* 244 F.3d at 5).   "This standard has been described as 'exceedingly narrow.'"

*McCoy v. Colvin*, Case No. 14-cv-30188-KAR, 2015 WL 4602011, at *6 (D. Mass. July 31,

2015) (quoting *Harrison v. Barnhart,* Civil Action No. 06–30005–KPN, 2006 WL 3898287, at

*2 (D. Mass. Dec. 22, 2006)).

Here, the Appeals Council did not commit an egregious error by failing to consider the

additional evidence.  "The regulations governing administrative appeals in this context make it

clear that, in order for additional evidence to justify review of an ALJ's decision, such evidence

must be new, material, related to the period at issue on or before the date of the hearing decision,

and reasonably expected to change the outcome of the decision."  *Mercogliano v. Berryhill*, Civil

No. 17-11276-LTS, 2018 WL 4375103, at *16 (D. Mass. Sept. 13, 2018) (citing 20 C.F.R. §§

404.970(a)(5), (b), 416.1470(a)(5), (b)).  To the extent Dr. Yurfest's records of June 20, 2017,

including the nerve conduction and EMG report concerning Plaintiff's right wrist, related to the

period after the ALJ's April 14, 2017 decision, Plaintiff failed to demonstrate that the wrist

condition existed prior to the ALJ's decision.  Consequently, the Appeals Council rightly rejected

those records (A.R. at 86).  *See Szubak v. Sec'y of Health & Human Servs.*, 745 F.2d 831, 833

(3d Cir. 1984) ("An implicit materiality requirement is that the new evidence relate to the time

period for which benefits were denied, and that it not concern evidence of a later-acquired

disability or of the subsequent deterioration of the previously non-disabling condition.") (citing

*Ward v. Schweiker*, 686 F.2d 762, 765 (9th Cir. 1982)); *Nelson v. Colvin*, No. 1:15-cv-00450-

JAW, 2016 WL 4059149, at *5 (D. Me. July 29, 2016), *rec. dec. accepted* 2016 WL 4506976

(D. Me. Aug. 26, 2016), *aff'd sub nom. Nelson v. Berryhill*, No. 16-2236, 2018 WL 565777 (1st

Cir. Jan. 24, 2018) ("Given that the records relate to treatment for a condition and symptoms that

developed after the ALJ's decision, the records do not support a determination that the ALJ's

decision 'might reasonably have been different' had he considered them.") (quoting *Evangelista*

*v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 140 (1st Cir. 1987)).

The remaining treatment records that Plaintiff submitted to the Appeals Council mirrored

the evidence that the ALJ considered.  "[W]hen the Appeals Council considers new evidence but

concludes that it did not provide a basis for changing the ALJ's decision, that conclusion is not

'egregiously mistaken' as long as the record evidence supports the decision."  *Lopez Davila,* 2018

WL 6704772, at *17 (citing *Roberson v. Colvin,* Civil No. 13-cv-265-JD, 2014 WL 243244, at

*4 (D.N.H. Jan. 22, 2014)).  Dr. Han's records of August 4 and November 15, 2016, and April 5,

2017 indicated that Plaintiff's gait was normal (A.R. at 38, 46, 50).  There was no tenderness in

his joints, bones, or muscles, and there was normal movement in all his extremities (A.R. at 38,

46, 50).  The record of April 5, 2017 indicates that Plaintiff fell walking his dog, but reported "no

back pain" (A.R. at 50).[6]  Similarly, the information regarding Plaintiff's back condition in Dr.

Yurfest's records of February 28 and April 25, 2017 was consistent with the evidence that was

included in the July 5, 2016 record that was before the ALJ.  On February 28, 2017, Dr. Yurfest

noted that Plaintiff's pain was 3/10 (A.R. at 52).  He had not picked up the gabapentin that had

been prescribed and was "moving better" (A.R. at 52).  Dr. Yurfest made the same observation

on April 25, 2017 (A.R. at 54).  In addition, Plaintiff reported that Baclofen was "helping" (A.R.

at 53).

---

[6] Plaintiff visited CHP on October 31, 2016 to obtain a flu shot (A.R. at 42).  The treatment
record for that visit does not reflect the results of a physical examination (A.R. at 40-42).

Plaintiff argues that Dr. Will's assessment of September 21, 2016 contradicts the ALJ's finding that Plaintiff was not disabled (Dkt. No. 22-1 at 8).  According to Plaintiff, by stating that Plaintiff's "pain has a mechanical quality that is easily explained by the spondylolisthesis at L5-S1," Dr. Will "correlated [Plaintiff's] complaints of constant and increasingly severe back and leg pain and radiculopathy to the spondylolisthesis at L5/S1" (A.R. at 64; Dkt. No. 22-1 at 8).  However, given that the ALJ determined that Plaintiff's back condition caused pain but not to the degree Plaintiff described, the Appeals Council correctly determined that Dr. Will's records would not have changed the ALJ's decision, particularly because Dr. Will indicated that "[p]alpation of the thoracolumbar spine and paraspinal muscles reveal[ed] no tenderness," Plaintiff's gait was normal, and straight let testing, cross straight leg testing, and Patrick's testing were negative bilaterally (A.R. at 7, 62, 77).  Like Dr. Yurfest, Dr. Will indicated that surgery was an option, but Dr. Will noted that Plaintiff "was neurologically intact and thus there is no absolute indication for the surgery, only for poor quality of life which it sounds like he is having" (A.R. at 52, 64).

Plaintiff has failed to establish a reasonable probability that the ALJ's decision would have been different if the ALJ had considered the treatment records Plaintiff submitted to the Appeals Council.  *See* 20 C.F.R. § 416.1470(a)(5).  Consequently, Plaintiff has failed to establish that the Appeals Council made an egregious error.[7]

**B.   The ALJ's determination that Plaintiff was not disabled due to his physical condition is supported by substantial evidence.**

1.   Plaintiff's spinal condition did not meet the requirements of Listing 1.04.

---

[7] Because the Commissioner does not challenge Plaintiff's assertion that there was good cause for not submitting the evidence to the ALJ, the court does not address that issue.  See 20 C.F.R. § 416.1470(b) ("The Appeals Council will only consider additional evidence . . . if [the claimant] shows good cause for not . . . submitting the evidence . . . ").

Plaintiff argues that the ALJ erred at step three of the sequential evaluation process by determining that Plaintiff's back condition did not meet or medically equal the requirements of Listing 1.04 of 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing 1.04"), titled disorders of the spine (Dkt. No. 22-1 at 10-14).

> To meet Listing 1.04, a claimant must show that he or she has a disorder of the spine with:
>
> > A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
> >
> > or
> >
> > B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
> >
> > or
> >
> > C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively[.]

*Carlin v. Berryhill*, No. 2:17-cv-00175-DBH, 2018 WL 2079504, at *3 (D. Me. May 4, 2018), *rec. dec. adopted,* 2018 WL 2347060 (D. Me. May 22, 2018) (quoting 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 1.04).  The ALJ found:

> There is no evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory reflex loss and positive straight-leg raising test; spinal arachnoiditis; or lumbar spinal stenosis resulting in pseudoclaudication with inability to ambulate effectively, as required by listing 1.04.

(A.R. at 73).  Because there was no evidence of arachnoiditis or lumbar spinal stenosis resulting in pseudoclaudication, the focus is on whether Plaintiff produced evidence to show that he

satisfied the criteria for Listing 1.04A.  *See Mills,* 244 F.3d at 6 (claimant has the burden to produce evidence that he meets the requirements of a listed condition).

"To satisfy a listing, a claimant must present evidence of medical findings that meet all specified medical criteria or are equal in severity to all the criteria for the most similar listed impairment."  *Avila v. Berryhill*, Civil Action No. 18-10898-FDS, 2019 WL 2537638, at *8 (D. Mass. June 20, 2019) (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); 20 C.F.R. § 404.1526(a)).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan,* 493 U.S. at 530.  In addition, the claimant "must have suffered, or be expected to suffer, all the elements of a listed impairment continuously for twelve months."  *Everngam v. Astrue*, Civil No. 08-cv-329-SM, 2009 WL 948654, at *4 (D.N.H. Apr. 6, 2009).  *See* 20 C.F.R. § 416.925(c)(3), (4).

Plaintiff relies on the report of the January 27, 2014 MRI indicating that "[t]he left L5 nerve root appears compressed" (A.R. at 299; Dkt. No. 22-1 at 11).  The ALJ considered this record (A.R. at 83).  That impression of nerve root compression was not repeated in other radiological studies and Dr. Yurfest's July 2016 electrodiagnostic studies excluded lumbar radiculopathy (nerve damage) (A.R. at 587, 593).

To the extent there was nerve compression at L5, Plaintiff failed to present evidence to support a finding of the other criteria necessary for a determination that he met or equaled the requirements of Listing 1.04A for the requisite twelve months or more.  Specifically, there was no evidence of limitations on spinal motion, motor loss accompanied by sensory or reflex loss, and positive straight leg raises in the sitting and supine positions persisting for the requisite twelve months.  *See Ortiz v. Astrue*, Civil Action No. 12-11359-RGS, 2013 WL 772677, at *4 (D. Mass. Feb. 27, 2013) ("Notwithstanding the absence of a showing of sensory or reflex loss,

[plaintiff] also did not demonstrate positive straight leg raise test results for a continuous twelve month period.").  Instead, the physical examinations of Plaintiff's back consistently showed normal range of motion, no muscle atrophy, normal motor and sensory reflexes, negative straight leg raises, and a normal gait (A.R. at 276, 301, 309, 367, 370, 372, 374, 376, 378, 382, 384, 386, 389, 391, 458, 492, 500, 512, 515, 536, 537, 559, 573, 576, 578, 587).  *See Patterson v. Colvin*, 662 F. App'x 634, 637 (10th Cir. 2016) ("even if the conditions [plaintiff] claims are equivalent to nerve root compression qualify under . . . [Listing 1.04A], . . . the evidence does not establish that all of the medical conditions were present at the same time for at least twelve months, as required to qualify."); *MacNeil v. Astrue*, 908 F. Supp. 2d 259, 265 (D. Mass. 2012) ("Even if such evidence indicates nerve root compression, . . . no evidence suggests that the compression was characterized by motor, sensory or reflex loss, as required under Listing 1.04.").

In addition, the state agency consultants considered the treatment records concerning Plaintiff's spine, but did not find that Plaintiff's condition met or equaled Listing 1.04 (A.R. 92-94, 454).  The fact that both agency nonexamining consultants discussed claimant's RFC meant that "they could only have rejected the possibility that any listing was met."  *Parker v. Colvin*, Civil No. 2:13-cv-286-DBH, 2014 WL 3533323, at *4 n.3 (D. Me. July 15, 2014).  Dr. Upadhyay considered Listing 1.04, assessed Plaintiff's physical RFC, and opined that Plaintiff could perform light work and was not disabled (A.R. at 92-94, 96-98).  Even if Dr. Weeratne did not specifically consider Listing 1.04, he agreed with Dr. Upadhyay's assessment of Plaintiff's RFC (A.R. at 454, 455).  *See Arrington v. Berryhill*, No. 17-1047, 2018 WL 818044, at *1 (1st Cir. Feb. 5, 2018) (upholding ALJ's finding that plaintiff did not satisfy a listing for joint dysfunction or spinal disorder where no physician or state consultant reported findings sufficient to satisfy a listing).

31

Plaintiff's contention -- that the ALJ did not accord adequate weight to his statements concerning his pain when assessing whether he met the criteria for Listing 1.04A – is similarly unavailing (Dkt. No. 22-1 at 13-14).  "[A] determination at step 3 is made primarily by reference to objective medical evidence."  *MacNeil*, 908 F. Supp. 2d at 266.

In summary, Plaintiff fails to sustain his burden of demonstrating that the ALJ erred at step three by finding that Plaintiff's condition did not meet or medically equal Listing 1.04A.

        2.      The ALJ's finding that Plaintiff could perform light or sedentary work and was not disabled by his physical condition was supported by the treatment records and the state agency consultants' opinions and the ALJ's assessment of the severity of Plaintiff's pain was supported by substantial evidence.

Because the ALJ found that Plaintiff's impairments did not meet or equal a listing at step three of the sequential evaluation process, he assessed Plaintiff's RFC "based on all the relevant medical and other evidence in [the] case record."  20 C.F.R. § 416.920(e).  The ALJ concluded that, "[a]lthough [Plaintiff did have] limitations, the objective evidence [did] not support total disability because he [could] still perform a limited range of light work," which included sedentary jobs (A.R. at 83).  *See* 20 C.F.R. § 416.967(b).  Plaintiff contends that the ALJ's conclusion is not supported by the treatment records and that the ALJ erred in assessing the Plaintiff's statements regarding the severity of his symptoms.  However, when the ALJ's findings are viewed under the substantial evidence standard, Plaintiff's contentions are unpersuasive.

        *(a)*      *The ALJ's evaluation of the objective medical evidence*

The treatment records of Dr. Tang, Dr. Han, Dr. Yurfest, and the emergency departments supported the ALJ's conclusion that Plaintiff was not disabled.  The ALJ relied on the records indicating that palpations of Plaintiff's back revealed mild tenderness, that he had normal range of motion and gait, that there was no muscle atrophy, and that bilateral straight leg raises were

normal on January 31, 2014 and July 5, 2016 (A.R. at 83, 276, 301, 309, 367, 370, 372, 374, 376, 378, 382, 384, 386, 389, 391, 393, 458, 492, 500, 512, 515, 536, 537, 559, 573, 576, 578, 587). On June 6, 2014 and in and March 2015, Dr. Tang observed that Plaintiff's back condition was stable (A.R. at 83, 367, 381, 458). The electrodiagnostic studies that Dr. Yurfest ordered in July 2016 indicated no involvement of the nerve roots (A.R. at 587).

The RFC was consistent with the medical opinions in the record. It is significant that no treating physician indicated that Plaintiff had exertional limitations that precluded him from performing the work indicated by the RFC. *See Barowsky v. Colvin,* Case No. 15-cv-30019-KAR, 2016 WL 634067, at *5 (D. Mass. Feb. 17, 2016) (treating physicians did not opine that plaintiff was disabled from working); *Konz v. Astrue,* Civil Action No. 09-11544-NMG, 2010 WL 5827402, at *7 (D. Mass. Nov. 8, 2010), *rec. dec. adopted* 2011 WL 578799 (D. Mass. Feb. 10, 2011) (the ALJ considered "the absence of opinions from treating or examining physicians which would support a finding that the claimant was disabled during the relevant period"). Indeed, Dr. Tang's encouragement of Plaintiff "to do suitable physical work, but [to] avoid heavy physical work," was consistent with the RFC (A.R. at 386).

"In the absence of opinion evidence from an acceptable medical source about the effect of Plaintiff's impairment on [his] ability to work, it was appropriate for the ALJ to give [partial] weight to the opinion evidence from the state agency [consultants]." *DeCepeda v. Berryhill*, Case No. 17-cv-30080-KAR, 2018 WL 3748170, at *13 (D. Mass. Aug. 6, 2018). *See Anderson v. Colvin*, Civil No. 14-cv-15-LM, 2014 WL 5605124, at *6 (D.N.H. Nov. 4, 2014) ("Without producing any opinion evidence contrary to the opinions of the state-agency consultants, or any opinions closer in time to [plaintiff's] hearing, there was no counterweight to the opinions on which the ALJ relied. Necessarily, the ALJ relied on the only medical opinions in the record.).

The ALJ found that Dr. Upadhyay's and Dr. Weeratne's opinions that Plaintiff could lift twenty pounds occasionally and ten pounds frequently, could stand and/or walk and sit for six out of eight hours in a normal workday, and could perform light work "was consistent with the record as a whole" (A.R. at 82, 93, 96-97, 454-55).  However, the RFC was more restrictive than the one the consultants proposed.  The ALJ added the sit/stand "'as needed'" option and the limitation on Plaintiff's use of his left (dominant) upper extremity based on his Cubital Tunnel Syndrome and left lumbar radiculopathy (A.R. at 75-76, 83).

> (b)    *The ALJ's evaluation of Plaintiff's description of his symptoms*

Plaintiff argues that the ALJ should have credited his allegations that he could lift and carry no more than five pounds, could sit, stand, and walk for ten minutes before changing positions, could not work because he had to recline for five or six hours a day, and suffered "excruciating" pain (Dkt. No. 22-1 at 13, 15-1, 17, 18-21).  However, the ALJ's finding that Plaintiff's statements were not "entirely consistent" with the objective medical evidence and other evidence in the record was supported by substantial evidence (A.R. at 84).  "[I]n a social security disability case, '[a] fact-finder's assessment of a party's credibility . . . is given considerable deference and, accordingly, a reviewing court will rarely disturb it."  *Smith v. Berryhill,* 370 F. Supp. 3d 282, 291 (D. Mass. 2019) (second alteration in original) (quoting *Anderson v. Astrue,* 682 F. Supp. 2d 89, 96 (D. Mass. 2010)).

Social Security Ruling 16-3p provides guidance on evaluating symptoms in disability cases.  According to that ruling, "[i]n determining whether an individual is disabled, [the ALJ] consider[s] all of the individual's symptoms, including pain, and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other

evidence in the individual's record." SSR 16-3p, 2017 WL 5180304, at *2 (Oct. 25, 2017).[8] The

analysis involves a two-step process. *Id.* The ALJ first considers "whether there is an

underlying medically determinable physical or mental impairment(s) that could reasonably be

expected to produce an individual's symptoms, such as pain." *Id.* at *3. "Second, once an

underlying physical or mental impairment(s) that could reasonably be expected to produce an

individual's symptoms is established, [the ALJ] evaluate[s] the intensity and persistence of those

symptoms to determine the extent to which the symptoms limit an individual's ability to perform

work-related activities . . . . " *Id.*

> When undertaking the second step, an ALJ must first determine whether the claimant's
> alleged symptoms are consistent with the objective medical evidence. If not, then the
> ALJ must consider the other evidence in the record, including "statements from the
> individual, medical sources, and any other sources that might have information about the
> individual's symptoms, including agency personnel, as well as the factors set forth in [the
> SSA's] regulations." SSR 16-3p, 2016 WL 1119029, at *5. The factors to which SSR
> 16-3p refers are set forth in 20 C.F.R. § [416.929](c)(3), and are sometimes called the
> *Avery* factors . . . .

*Martin v. Berryhill*, Civil No. 18-cv-461-JL, 2019 WL 1987049, at *5 (D.N.H. May 6, 2019)

(citing *Avery v. Sec'y of Health & Human Servs.,* 797 F.2d 19, 29 (1st Cir. 1986)). The *Avery*

factors include:

> 1. Daily activities;
> 2. The location, duration, frequency, and intensity of pain or other symptoms;
> 3. Factors that precipitate and aggravate the symptoms;
> 4. The type, dosage, effectiveness, and side effects of any medication an individual takes
> or has taken to alleviate pain or other symptoms;
> 5. Treatment, other than medication, an individual receives or has received for relief of
> pain or other symptoms;
> 6. Any measures other than treatment an individual uses or has used to relieve pain or
> other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every
> hour, or sleeping on a board); and
> 7. Any other factors concerning an individual's functional limitations and restrictions due
> to pain or other symptoms.

---

[8] A "symptom" is defined as "the individual's own description or statement of his or her physical
or mental impairment(s)." SSR 16-3p, 2017 WL 5180304, at *2.

SSR 16-3p, 2016 WL 1119029, at *7.  *See Avery,* 797 F.2d at 29.  Although an ALJ is not

required to address every *Avery* factor in his written decision, *see Vega v. Astrue,* Civil Action

No. 11-10406-WGY, 2012 WL 5989712, at *8 (D. Mass. Mar. 30, 2012), he must consider "the

entire case record" in making his finding regarding the intensity and persistence of the claimant's

symptoms and the extent to which they limit the claimant's ability to perform work-related

activities.  SSR 16-3p, 2017 WL 5180304, at *5-10.  *See Barowsky*, 2016 WL 634067, at *5

("The ALJ was entitled, indeed required, to consider all of the evidence of record when weighing

the credibility of [p]laintiff's subjective claims of pain.").

     The ALJ followed the analysis required by SSR 16-3p.  At the first step, the ALJ

recognized Plaintiff's back condition as a medically determinable impairment that could

reasonably be expected to produce pain (A.R. at 77).  At the second step, because the ALJ

determined that Plaintiff's alleged symptoms were not supported by the objective medical

evidence, he considered the other record evidence in light of the *Avery* factors (A.R. at 84).  *See*

20 C.F.R. § 416.929(c)(3); SSR 16-3p, 2016 WL 1119029, at *5.

     The ALJ's assessment of Plaintiff's description of the intensity and persistence of his

symptoms was supported by the record evidence.  Plaintiff reported that he vacuumed, shopped,

played video games with his children, played board games, read, and watched TV (A.R. at 77,

240, 658, 659).  Although Plaintiff testified that he played only three holes of golf with his

friends, on April 19, 2016, he told emergency department personnel that he had been golfing

during the past two days (A.R. at 530, 532, 536, 673-74).  *See Avery,* 797 F.2d at 29 (claimant's

daily activities are a factor to be considered in the pain analysis).  Plaintiff indicated that PT, a

chiropractic treatment, trigger point injections, and medication relieved his back pain (A.R. at 83,

202, 368, 372, 373, 374, 378, 448, 586).  *See Avery,* 797 F.2d at 29 (the duration, frequency, and

intensity of pain and the effectiveness of medication and other treatments are factors to be

considered in evaluating a claimant's statements about her pain); 20 C.F.R. § 416.929(c)(3)(ii),

(iv), (v) (same).  On March 31, 2016, Plaintiff told N.P. Vardman that rest, heat, and Aleve

relieved his pain (A.R. at 557).  *See Boulia v. Colvin*, Case No. 15-cv-30103-KAR, 2016 WL

3882870, at *7 (D. Mass. July 13, 2016) ("[T]he ALJ properly considered the type of medication

[p]laintiff was taking and treated his reliance on over-the-counter pain medication as a factor

bearing on the credibility of his claim of disabling pain."); *Suarez-Linares v. Comm'r of Soc.

Sec.*, 962 F. Supp. 2d 372, 379 (D.P.R. 2013) (ALJ properly relied on the "generally conservative

nature" of plaintiff's pain medication regimen as a factor undermining plaintiff's claim of

disabling pain).

        Because Plaintiff's statements regarding the severity of his pain and the extreme

limitations on his ability to walk, stand, lift, and carry were not supported by other record

evidence, the ALJ was not required to credit them.  *See Augustin v. Berryhill,* 375 F. Supp. 3d

135, 142 (D. Mass. 2019) (resolving conflicts in the evidence is the province of the ALJ, not the

courts) (quoting *Johnson v. Colvin,* 204 F. Supp. 3d 396, 407 (D. Mass. 2016)).  On March 26,

2014 and March 31, 2016, Plaintiff indicated that he could lift up to twenty pounds without

experiencing pain (A.R. at 195, 198, 557).[9]  Throughout the record, treatment providers

indicated that Plaintiff's back pain was not severe (A.R. at 275 [no back pain], 383 [generally

"feeling fine"], 385 ["not so bad lately"], 388 ["somewhat better"], 390 [low back pain "from

time to time"], 449 [feeling better "lately"] [pain had improved with exercise], 573

["improving"]).  Similarly, the ALJ was permitted to rely on the treatment records to discount

---

[9] Even if Plaintiff was limited to lifting up to ten pounds, the VE identified sedentary, unskilled
jobs that Plaintiff could perform (A.R. at 682-83).

Plaintiff's testimony that his pain caused him "horrible" sleep (A.R. at 368, 373, 375, 381, 383, 385, 388, 390, 394, 456, 557-58, 586, 668).  *See Coffman v. Astrue*, 469 F. App'x 609, 610 (9th Cir. 2012) ("The ALJ discounted [plaintiff's] credibility based on inconsistent statements he made to his treatment providers and to the Commissioner."); *Franceschi v. Astrue,* Civil Action No. 11-40217-TSH, 2013 WL 1285478, at *12 (D. Mass. Mar. 25, 2013) (the ALJ considered the discrepancies between the plaintiff's testimony and the treatment records when assessing the severity of symptoms); SSR 16-3p, 2017 WL 5180304, at *8 (ALJ compares "statements an individual makes in connection with the . . . claim for disability benefits with any existing statements [he] made under other circumstances.").

Plaintiff faults the ALJ's finding that Plaintiff "was not always compliant with medical care . . . " (A.R. at 83).  There was, however, evidence of Plaintiff's failure to comply with some treatment recommendations.

> SSR [16-3p] does not preclude an ALJ, in assessing the claimant's symptoms, from considering whether a claimant has complied with treatment for the pain that the claimant purports to be suffering.  In accord with the common-sense notion that a person who does not follow a course of treatment for pain may not be suffering from that pain as intensely as the person claims, SSR 16–3p expressly provides that an ALJ must "consider an individual's attempts . . . to follow treatment once it is prescribed when evaluating whether symptom intensity and persistence affect the ability to perform work-related activities for an adult or the ability to function independently."

*Coskery*, 892 F.3d at 6 (quoting SSR 16-3p, 2017 WL 5180304, at *9).  *See Stimson v. Astrue*, Civil Action No. 10-30193-KPN, 2011 WL 6132025, at *5 (D. Mass. Dec. 1, 2011) (ALJ considered plaintiff's noncompliance with treatment in assessing his subjective statements). Although Plaintiff indicated that PT alleviated his back pain (A.R. at 373, 374, 448), Williamstown Physical Therapy discharged him on March 3, 2015 because he was a "no-show" to appointments and a therapist indicated that he showed "poor compliance" with a home exercise program (A.R. at 440, 441).  *See Christopher D. v. Berryhill,* No. 1:17-cv-00377-JHR,

2018 WL 4087477, at *4 (D. Me. Aug. 24, 2018) (the ALJ drew a negative inference from the

plaintiff's failure to complete PT); *Dwyer v. Astrue,* Civil Action No. 11-12048-JGD, 2013 WL

3965398, at *5 (D. Mass. July 31, 2013) (plaintiff's election to discontinue PT undermined her

credibility).

 Plaintiff bore the burden to present sufficient evidence to demonstrate how his alleged

impairment limited his functional capacity.  *See Caterino v. Berryhill*, 366 F. Supp. 3d 187, 194

(D. Mass. 2019) (citing cases).  For the reasons discussed above, Plaintiff failed to sustain his

burden.

> 3.    When assessing the severity of Plaintiff's condition, the ALJ properly
>        considered his observations of Plaintiff at the evidentiary hearing.

Plaintiff faults the ALJ for considering his observations of Plaintiff's condition at the

evidentiary hearing and using his observations to determine that Plaintiff could work (Dkt. No.

22-1 at 14-15).  In assessing the severity of Plaintiff's pain, the ALJ noted that Plaintiff:

> walked in spryly and moved well.  He had no problems sitting and he testified well.
> [Plaintiff] provided good job descriptions and history.  He used his hands and arms
> frequently and extensively in expressing himself, including reaching overhead with ease,
> to show how past work was done.  [Plaintiff] stood after 25 minutes for two minutes, and
> again at 60 minutes for three minutes.

(A.R. at 76).  In response, Plaintiff's attorney submitted an affidavit indicating that the distance

between the door and Plaintiff's chair was "no greater than three feet" (Dkt. No. 22-2 ¶ 3).

First, the court is limited to considering "only the record developed at the administrative

agency, as certified to this [c]ourt by defendant" and is "precluded from considering any

evidence aside from the evidence in the record."  *Mercado v. Sec'y of Health & Human Servs.*,

573 F. Supp. 1023, 1025 (D.P.R. 1983) (citing 42 U.S.C. § 405(g)).  *See Aldea v. Astrue*, 828 F.

Supp. 2d 396, 401 (D. Mass. 2011) ("It is well-settled that an administrative law judge is not

permitted to rely on evidence outside the record."). Consequently, Plaintiff's attorney's affidavit is not part of the administrative record.

Moreover, the ALJ was entitled to rely, in part, on his observations of Plaintiff's condition and demeanor at the hearing. "[A]n ALJ may also rely upon [his] own observations of the claimant at the hearing when evaluating the credibility of the claimant's complaints." *Shaw v. Colvin*, Civil No. 13-cv-503-JL, 2015 WL 1097419, at *3 n.1 (D.N.H. Mar. 11, 2015). *See* SSR 16-3p, 2017 WL 5180304, at *7 ("The adjudicator will consider any personal observations of the individual in terms of how consistent those observations are with the individual's statements about his or her symptoms as well as with all of the evidence in the file."). Even if the ALJ should not have relied upon his observations of Plaintiff, any error was harmless in view of the other substantial evidence supporting his decision. *See Rivera v. Comm'r of Soc. Sec. Admin.*, Civil No. 12–1479(BJM), 2013 WL 4736396, at *11 (D.P.R. Sept. 3, 2013) ("An 'ALJ's error is harmless where it is 'inconsequential to the ultimate nondisability determination.'") (quoting *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012)). [10]

---

[10] Plaintiff contends that his Cubital Tunnel Syndrome and Carpal Tunnel Syndrome precluded him from performing the jobs the ALJ identified because they required "constant, repetitive" use of the hands (Dkt. No. 22-1 at 16-17). As discussed earlier, the records concerning Plaintiff's newly diagnosed carpal tunnel disorder post-dated the ALJ's decision and could not be considered by the Appeals Council. *See Nelson*, 2016 WL 4059149, at *5; 20 C.F.R. § 416.970(a)(5), (b). The RFC's limitation to "frequent, but less than constant forceful grasping or twisting motions" with the dominant left hand and wrist recognized Plaintiff's Cubital Tunnel Syndrome (A.R. at 75). The SSA defines "frequent" as "'occurring from one-third to two-thirds of the time' during the workday." *Andrade-Hermort v. Berryhill,* 292 F. Supp. 3d 530, 531 n.2 (D. Mass. 2018) (quoting SSR 83-10, 1983 WL 31251, at *6 (1983)). Based on Plaintiff's activities of daily living, including playing video games and using the computer, and the ALJ's observations of Plaintiff's "frequent and extensive" use of his hands at the hearing, the RFC was supported by substantial evidence (A.R. at 76, 204, 240). In addition, because the hypothetical that the ALJ posed to the VE included the limitation contained in the RFC and the VE identified jobs that were available in the national and regional economy to a person with that limitation, Plaintiff's allegation – that the identified jobs required "constant, repetitive" use of both hands – is not supported.

**C.**     **The ALJ's determination that Plaintiff was not disabled due to his mental condition is supported by substantial evidence.**

1.     Plaintiff's mental condition did not meet the criteria of Listing 12.05.

Mainly relying on his full-scale IQ score of 77, Plaintiff contends that his mental condition met the requirements of the "'A' and 'B' provisions of [L]isting 12.05" and the ALJ erred by failing to make this determination at step three of the sequential evaluation process (Dkt. No. 22-1 at 21).  Because Plaintiff has failed to satisfy his burden of proving that he satisfied the listing, his claim is unavailing.  *See Libby v. Astrue,* 473 F. App'x 8, 8 (1st Cir. 2012) (per curiam) (citing *Dudley v. Sec'y of Health & Human Servs.,* 816 F.2d 792, 793 (1st Cir. 1987) (per curiam)).

Listing 12.05 describes the criteria for Intellectual Disorders.  *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.00B(4).  The introductory paragraph states:

> [An intellectual disorder] is characterized by significantly subaverage general intellectual functioning, significant deficits in current adaptive functioning, and manifestation of the disorder before age 22.  Signs may include, but are not limited to, poor conceptual, social, or practical skills evident in . . . adaptive functioning.

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.00B(4)(a).  *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.00H(3)(a) ("Adaptive functioning refers to how [a claimant] learn[s] and use[s] conceptual, social, and practical skills in dealing with common life demands. It is claimant's typical functioning at home and in the community, alone or among others.").

In addition to the introduction, "Listing 12.05 has two paragraphs, designated A and B, that apply to only intellectual disorder [sic]."  20 C.F.R. § 404, Subpart P, Appendix 1, Listing 12.00A(3).  "Thus, Listing 12.05 'contains two parts:  (1) an introductory paragraph that describes [intellectual disorder] in terms of subaverage intellectual functioning and deficits in adaptive functioning manifest before age 22; and (2) subparagraphs specifying the required level

41

of severity.'" *Alves v. Colvin*, C.A. No. 14-229 S, 2015 WL 6809823, at *1 (D.R.I. Nov. 5, 2015)

(quoting *Libby,* 473 F. App'x at 8–9). "To be considered disabled pursuant to Listing 12.05,

Plaintiff must meet both the requirements of the introductory paragraph and the requisite level of

severity in one of the subparagraphs." *Id.* (citing *Libby,* 473 F. App'x at 8). A showing of all

three criteria in either subparagraph is required. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1,

Listing 12.05A and B.

      In determining that Plaintiff did not satisfy the listing, the ALJ separately considered

subparagraphs A and B (A.R. at 74-75). Subparagraph A requires a claimant to show:

> 1. Significantly subaverage general intellectual functioning evident in [his] cognitive
> inability to function at a level required to participate in standardized testing of intellectual
> functioning; and

> 2. Significant deficits in adaptive functioning currently manifested by [his] dependence
> upon others for personal needs (for example, toileting, eating, dressing, or bathing); and

> 3. The evidence about [his] current intellectual and adaptive functioning and about the
> history of [his] disorder demonstrates or supports the conclusion that the disorder began
> prior to [his] attainment of age 22.

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.05A.

      The ALJ's conclusion that Plaintiff did not meet the requirements of subparagraph A of

Listing 12.05 was supported by substantial evidence (A.R. at 75). Plaintiff was able to

participate in the standardized IQ testing Dr. Guenther conducted (A.R. at 75, 404-06). *See* 20

C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.05A(1). In addition, Plaintiff attributed his

dependence on others for personal care to his physical, not mental, limitations (A.R. at 75, 205,

221, 237). *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.05A(2). Plaintiff lived

with his wife and children, prepared meals, vacuumed, drove a car, used public transportation,

used a computer, played video games, played golf with his friends, and had operated a cash

register at Ocean State Job Lot (A.R. at 75).  *See* 20 C.F.R. Part 404, Subpart P, Appendix 1,

Listing 12.05A(2).

Similarly, the ALJ's finding that Plaintiff did not meet all three criteria for subparagraph

B was supported by substantial evidence.  In order to meet the requirements of subparagraph B,

Plaintiff was required to show:

1. Significantly subaverage general intellectual functioning evidenced by a or b:

   a. A full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence; or

   b. A full scale (or comparable) IQ score of 71–75 accompanied by a verbal or performance IQ score (comparable part score) of 70 or below on an individually administered standardized test of general intelligence; and

2. Significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:

   a. Understand, remember, or apply information . . . ; or

   b. Interact with others . . . ; or

   c. Concentrate, persist, or maintain pace . . . ; or

   d. Adapt or manage oneself . . . ; and

3. The evidence about [the claimant's] current intellectual and adaptive functioning and about the history of [his] disorder demonstrates or supports the conclusion that the disorder began prior to [his] attainment of age 22.

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.05B.  Plaintiff's full-scale IQ score of 77

and the state agency consultants' opinions -- that Plaintiff did not have extreme limitations in one

of the adaptive functioning criteria or marked limitations in two of the criteria -- precluded his

ability to meet the requirements of Listing 12.05B(1) and (2) (A.R. at 75, 91, 405, 453).  There

were no contrary opinions.  *See Anderson,* 2014 WL 5605124, at *6.  Consequently, the ALJ did

not err at step three of the sequential evaluation process.

2.      Substantial evidence supported the RFC's limitations based upon
        Plaintiff's mental condition.

The RFC limited Plaintiff to performing simple one-to-two step tasks, taught by

demonstration, with rare changes in routine (A.R. at 76).  Contrary to Plaintiff's claim, the

treatment records and other evidence did not support additional limitations (Dkt. No. 22-1 at 18).

(a)      *Records of treatment providers and consultants*

Although Dr. Guenther opined that Plaintiff's test scores reflected "a learning

disability/borderline intellectual functioning," she found that that he was capable of "following

and understanding simple directions and instructions" (A.R. at 83-84, 406, 407).  This opinion

was consistent with those of the state agency consultants who determined that Plaintiff could:

understand and remember simple instructions; complete simple, routine tasks; and sustain

concentration for at least two hours in simple one and two step tasks (A.R. at 83, 94-95, 107,

453, 455).

The Brien Center and Dr. Guenther diagnosed Plaintiff with anxiety disorder NOS (A.R.

at 407, 425).  However, according to the record, Plaintiff stopped treating with The Brien Center

after four sessions (A.R. at 410-29).  *See Stimpson,* 2011 WL 6132025 at *6 (voluntary cessation

of mental health treatment supported an adverse credibility determination).  The records of other

treatment providers showed that Plaintiff's mood and affect were normal without signs of anxiety

(A.R. at 301, 479, 480, 490, 492, 500, 515, 536, 537, 573).  On March 31, 2016, N.P. Vardman

indicated that Plaintiff reported that his depression and anxiety had improved after he stopped

drinking alcohol (A.R. at 558).  Plaintiff testified that he did not take anxiety medication

regularly (A.R. at 671).

(b)      *The ALJ's assessment of the severity of Plaintiff's symptoms*

44

Citing a Disability Report – Appeal form that he completed and his hearing testimony, Plaintiff alleges that the ALJ ignored his statements concerning his medications' effects on his ability to function (Dkt. No. 22-1 at 18, citing A.R. at 247). However, the RFC's restriction to simple one-to-two step tasks accommodated any side effects of Plaintiff's medications.

Plaintiff's statements concerning the impact of his medications on his mental abilities were inconsistent with evidence in the record. "Determinations of credibility and the resolution of conflicts in the evidence are for the Commissioner and not for the doctors or for courts." *Nunes v. Berryhill*, Civil No. 16-CV-11499-LTS, 2017 WL 4169748, at *1 (D. Mass. Sept. 20, 2017) (citing *Rodriguez,* 647 F.2d at 222). As the ALJ noted, Plaintiff's testimony that his medications made him drowsy or tired conflicted with treatment providers' observations that Plaintiff was "alert" during visits (*see, e.g.,* A.R. at 83, 276, 309, 319, 480, 492, 537, 559, 578, 669, 670). *See, e.g., Burns v. Barnhart,* 312 F.3d 113, 131 (3d Cir. 2002) ("Drowsiness often accompanies the taking of medication, and it should not be viewed as disabling unless the record references *serious* functional limitations.") (emphasis added). The SSA interviewer noted that Plaintiff did not exhibit difficulty understanding, articulating, or concentrating during the face-to-face interview. *See* SSR 16-3p, 2017 WL 5180304, at *7 (the ALJ can consider the statements of the SSA interviewer). Plaintiff's complaints about the adverse side effects of his medications are also inconsistent with the ALJ's observation of his adequate memory at the hearing and with his activities of daily living, including driving, taking public transportation, going out alone, shopping, reading, and playing board and video games (A.R. at 76, 83). *See Mendez v. Berryhill,* CIVIL ACTION NO. 17-10069-JGD, 2018 WL 3029048, at *15 (D. Mass. June 18, 2018) (ALJ relied on plaintiff's activities of daily living when determining whether her functional capacity was limited by the side effects of her medications); *Teixeira v. Astrue,* 755 F.

45

Supp. 2d 340, 347 (D. Mass. 2010) ("[E]vidence of daily activities can be used to support a negative credibility finding.") (citing *Berrios Lopez v. Sec'y of Health & Human Servs.,* 951 F.2d 427, 429 (1st Cir. 1991)).

The Disability Report – Appeal form upon which Plaintiff relied contained information that conflicted with other information in the record (Dkt. No. 22-1 at 18).  On the form, Plaintiff identified Tramadol as a medication that made him dizzy and drowsy (A.R. at 231, 247).  Tramadol, which contains opioids, was prescribed for Plaintiff's back pain (A.R. at 202, 456).  *See Jackson v. Berryhill*, Civil No. 18-cv-01000-JL, 2019 WL 2417508, at *2 n.2 (D.N.H. June 7, 2019) ("Tramadol is an 'opioid analgesic used for the treatment of moderate to moderately severe pain.'") (quoting DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 513 (32nd ed. 2012)).  On the SSA pain questionnaire form that Plaintiff completed, he indicated that he took Tramadol for pain relief and that his medications caused "numbness and tingly feelings" (A.R. at 202).  He did not mention other side effects including dizziness, weakness, or drowsiness (A.R. at 202).  On the other hand, he told a physical therapist that he did not take opioids and he testified that he discontinued Oxycodone (an opioid) because he did not want to become addicted and "it just wasn't helping anyway" (A.R. at 202, 593, 653, 670).  Consequently, according to the records, either Plaintiff did not take Tramadol or, if he did, Plaintiff offered conflicting statements concerning its side-effects and the ALJ could discount them.  Aside from the Disability Report – Appeal form and his testimony, Plaintiff fails to point to other record evidence to support his claim concerning the negative side effects of his medications (Dkt. No. 22-1 at 18).  *See Lacroix v. Barnhart,* 352 F. Supp. 2d 100, 115 (D. Mass. 2005) (plaintiff's failure to develop the record beyond mere mentions of prescription medication side effects did not warrant reversal of ALJ's determination).

46

In summary, Plaintiff has failed to demonstrate that his mental impairments were more severe than those reflected in the RFC.

VI.   CONCLUSION

For the above-stated reasons, Plaintiff's Motion for an Order Reversing the Decision of the Commissioner (Dkt. No. 22) is DENIED and the Commissioner's Motion for an Order Affirming the Decision of the Commissioner (Dkt. No. 29) is GRANTED.  The case will be closed.

It is so ordered.

Dated:  August 21, 2019                                    /s/ Katherine A. Robertson
                                                          KATHERINE A. ROBERTSON
                                                          U.S. MAGISTRATE JUDGE